**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| DALIA RASHDAN (MOHAMED), *Plaintiff-Appellant*, <br><br> v. <br><br> MARC GEISSBERGER; EUGENE LABARRE; AI B. STREACKER; FOROUD HAKIM; NADER A. NADERSHAHI; PATRICK J. FERRILLO, JR.; LEIGH ANDERSON; JEFF MILES; DANIEL J. BENDER; LOLA GIUSTI; CRAIG YARBOROUGH; DOES 1–50; UNIVERSITY OF THE PACIFIC, *Defendants-Appellees*. | No. 12-16305 <br><br> D.C. No. 4:10-cv-00634-SBA <br><br><br> OPINION |

Appeal from the United States District Court
for the Northern District of California
Saundra B. Armstrong, District Judge, Presiding

Submitted August 15, 2014[*]
San Francisco, California

Filed August 26, 2014

---

[*] The panel unanimously concludes this case is suitable for decision without oral argument. *See* Fed. R. App. P. 34(a)(2).

Before: M. Margaret McKeown and Richard R. Clifton, Circuit Judges, and David Alan Ezra, District Judge.[**]

Opinion by Judge McKeown

**SUMMARY[***]**

**Employment Discrimination**

The panel affirmed the district court's summary judgment on a claim of national origin discrimination in violation of Title VI of the Civil Rights Act of 1964.

Joining other circuits, the panel held that the *McDonnell Douglas* framework for disparate treatment claims under Title VII applied to the Title VI claim. Under this analysis, the plaintiff did not establish a prima facie case of national origin discrimination.

---

[**] The Honorable David A. Ezra, District Judge for the U.S. District Court for the District of Hawaii, sitting by designation.

[***] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

**COUNSEL**

Jay T. Jambeck and Mandy G. Leigh, Leigh Law Group, San Francisco, California, for Plaintiff-Appellant.

Michael J. Vartain and Kathryn J. Burke, Vartain Law Group, San Francisco, California, for Defendants-Appellees.

**OPINION**

McKEOWN, Circuit Judge:

Dalia Rashdan (Mohamed) was enrolled in a dentistry program for international students at the University of the Pacific. She appeals from the district court's grant of summary judgment in favor of the University and several instructors and administrators on her claim of national origin discrimination in violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000d *et seq*. We join our sister circuits in holding that the *McDonnell Douglas* framework for disparate treatment claims under Title VII applies to Rashdan's Title VI claim. Under this analysis, Rashdan's claim fails because she did not establish a prima facie case of national origin discrimination.

## BACKGROUND AND PROCEDURAL HISTORY

Rashdan, an Egyptian dentist, was enrolled in a two-year International Dental Studies Program to credential her for practice in the United States. Three months before graduation, Rashdan followed her clinical supervisor's instructions to seat a crown, but the procedure was unsuccessful. After the head of the restorative dentistry

program, Dr. Geissberger, heard from a colleague about the failed crown seating, he told Rashdan—within earshot of other faculty, students, and patients—that her "clinical work on the patient . . . was 'Third World Dentistry.'"

Offended by the remark, Rashdan confronted Geissberger in his office, explaining that the crown-seating procedure was her clinical supervisor's idea and that she was simply carrying it out as his student. Geissberger told her that the procedure was "nowhere in the syllabus." Rashdan again explained that her clinical supervisor had proposed the procedure and that she "did not feel that it was [her] place to question the direction of a respected faculty member." Geissberger responded: "It's still Third World Dentistry." Rashdan replied: "I am offended by that remark." Geissberger then asked her where she was from and, when she said Egypt, he stated that Egypt was "not a Third World country." Rashdan retorted: "Yes it is." Geissberger insisted: "No it's not and it's still Third World Dentistry." Rashdan ended the conversation by saying: "Yes it is. And in any case I learned this Third World Dentistry in your First World clinic."

Shortly after her exchange with Geissberger, another supervisor, Dr. Hakim, greeted Rashdan by saying, "What's up, TW?" Rashdan looked puzzled, so Hakim clarified: "Oh come on! Don't you get it? . . . Third World?" A few months later, Rashdan sent Hakim an effusive thank you e-mail for assisting her with a procedure, which she signed "Dalia Rashdan Mohamed a.k.a. T.W."

Four days before graduation, Rashdan was informed that despite her more than adequate performance in course work, she was not recommended for graduation and that she would

have to remediate in restorative dentistry and removable prosthodontics. Rashdan entered an additional quarter of clinical work at no extra cost during which her performance did not improve; evaluators stated that she was actively harming patients and her performance was "clinically unacceptable." Geissberger and other faculty exchanged emails discussing her poor performance, attempting to come up with a "strategy" to ensure that Rashdan would not practice dentistry in the United States until she could do so safely.

The faculty settled on a recommendation that Rashdan pursue an additional quarter of remedial work on models, after which she could return to clinical work on patients. Geissberger informed Rashdan of the recommendation and called a meeting to discuss it with her, but the day before the meeting, Rashdan submitted a request for absence. The meeting went on without Rashdan, and the faculty sent her a proposed remediation plan, echoing the earlier recommendation and communicating the faculty's hope that Rashdan would "consider returning to school at [her] earliest convenience to fulfill the requirements of the [remediation] plan and earn [her] degree." When Rashdan did not respond, a committee accepted the plan on her behalf, and she was notified of a right of appeal. Rather than appeal the plan or begin the recommended remediation, Rashdan took a leave of absence, did not return to school, and filed this lawsuit.

## ANALYSIS

### I. Title VI Framework

Title VI provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be

excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. Similarly, Title VII prohibits an employer from "discriminat[ing] against any individual . . . because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). In *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), the Supreme Court "set forth the basic allocation of burdens and order of presentation of proof in a Title VII case alleging discriminatory treatment." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252–53 (1981).

> First, the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination. Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the employee's rejection. Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.

*Id.* (internal citations and quotation marks omitted).

Although we have yet to consider whether *McDonnell Douglas* applies to Title VI disparate treatment claims, we have "look[ed] to" Title VII doctrines to analyze other Title VI claims. *See, e.g.*, *Darensburg v. Metro. Transp. Comm'n*, 636 F.3d 511, 519 (9th Cir. 2011) (disparate impact). We

now join the other circuits in concluding that *McDonnell Douglas* also applies to Title VI disparate treatment claims. *See, e.g.*, *Gazarov ex rel. Gazarov v. Diocese of Erie*, 80 F. App'x 202, 203–05 (3d Cir. 2003) (opinion); *Bryant v. Indep. Sch. Dist. No. I-38 of Garvin Cnty., Okla.*, 334 F.3d 928, 929–30 (10th Cir. 2003); *Fuller v. Rayburn*, 161 F.3d 516, 518 (8th Cir. 1998); *Ga. State Conference of Branches of NAACP v. State of Ga.*, 775 F.2d 1403, 1417 (11th Cir. 1985), *abrogated on other grounds by Lee v. Etowah Cnty. Bd. of Educ.*, 963 F.2d 1416, 1419 n.3 (11th Cir. 1992).

## II. Applying *McDonnell Douglas* to Rashdan's Title VI Claim

Although "[t]he requisite degree of proof necessary to establish a *prima facie* case for [a] Title VII . . . claim[] on summary judgment is minimal and does not even need to rise to the level of a preponderance of the evidence," Rashdan's claim fails. *Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 889 (9th Cir. 1994). On de novo review, the undisputed facts viewed in the light most favorable to Rashdan do not "give[] rise to an inference of unlawful discrimination." *See Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1219–20 (9th Cir. 1998) (internal quotation marks and alteration omitted).

Evidence of discriminatory motive can be direct or indirect. *Burdine*, 450 U.S. at 256 (citing *McDonnell Douglas*, 411 U.S. at 804–05). "Direct evidence is evidence which, if believed, proves the fact [of discriminatory animus] without inference or presumption." *Vasquez v. Cnty. of L.A.*, 349 F.3d 634, 640 (9th Cir. 2003) (alteration in original) (internal quotation marks omitted). Rashdan's direct evidence of discriminatory intent—Geissberger's comment that her work was "Third World dentistry," Hakim's

reference to her as "TW," and the discussion of a "strategy" about how to deal with her subpar clinical performance—do not support a claim of discriminatory animus.  To be sure, the "Third World" reference was an offensive, insensitive, and politically incorrect jab; it was directed, however, at the procedure, not Rashdan's national origin.  *See Stallcop v. Kaiser Found. Hosps.*, 820 F.2d 1044, 1051 (9th Cir. 1987) ("[D]erogatory ethnic statements, unless excessive and opprobrious, are insufficient to establish a case of national origin discrimination.").  In context, construing all inferences in favor of Rashdan, Geissberger's statement about "Third World Dentistry," referred to the procedure that Rashdan's supervisor ordered.  Rashdan acknowledges that no one affiliated with the University made any disparaging comment about Egypt or its people, customs, culture, religious practices, or traditions, and she referred to herself as "TW" in an e-mail to Hakim.  Rashdan also offers no link between statements about a "strategy" to address her performance and any comments about the "Third World."

Rashdan's indirect evidence of allegedly similarly situated students who were permitted to graduate also fails to establish a prima facie case of discriminatory animus. Rashdan offers grades, clinical competency ratings, and faculty comments for certain students whom she claims performed as well or worse than she did, but Rashdan offers no context to evaluate this data.  A laundry list of scores proves nothing in the absence of context or explanation.  *See Dandy v. United Parcel Serv., Inc.*, 388 F.3d 263, 274 (7th Cir. 2004) ("[The plaintiff] has given this court no concrete way to measure the candidates she alleges were unlawfully promoted over her and instead has taken a 'kitchen sink' approach to her appeal by listing every white male employee promoted to a rank higher than full-time supervisor without

identifying any coherent method of analysis."). Simply offering up clinical scores of students who graduated and students sent for their own tailor-made remediation programs is insufficient to meet a minimum threshold of identifying students who are similarly situated to Rashdan. These comparators miss the mark of establishing anything, let alone a category of similarly situated individuals.

Rashdan's direct and indirect evidence of discriminatory motive falls short of establishing a prima facie case.[1]

**AFFIRMED.**

---

[1] We also note that even if Rashdan had established a prima facie case of discrimination, her claim nonetheless fails because she did not rebut the legitimate, non-discriminatory justification for the additional remediation, namely that she was performing very poorly in clinical restorative dentistry. *See Vasquez*, 349 F.3d at 641–42.